# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:14-cr-00178-JAD-GWF |
| | ) | |
| vs. | ) | **FINDINGS &** |
| | ) | **RECOMMENDATIONS** |
| | ) | |
| IAN ALEXANDER PINCOMBE | ) | **Motion to Dismiss for** |
| | ) | **Outrageous Government** |
| Defendant. | ) | **Conduct (#41)** |
| | ) | |

This matter is before the Court on Defendant Ian Alexander Pincombe's Motion to Dismiss for Outrageous Government Conduct (#41), filed on December 29, 2013. The Government filed its Response (#62) on July 6, 2015, and the Defendant filed his Reply (#69) on September 11, 2015. The Court conducted a hearing in this matter on October 5, 2015.[1] At the Court's direction, Defendant filed a Supplement (#76) to his motion, attaching the text-email communications referenced in the motion, but which were not attached as exhibits.

## BACKGROUND

The indictment in this case charges Defendant Ian Alexander Pincombe with coercion and enticement in violation of 18 U.S.C. § 2422(b); possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B); and receipt or distribution of child pornography in violation of 18 U.S.C. 2252(a)(2) & (b)(1). These charges arise out of an undercover "reverse sting" operation that Detective Tuan Yurek of the Henderson Nevada Police Department launched in response to a "casual encounter" advertisement that Defendant Pincombe allegedly posted on Craigslist.com on

---

[1] The time for response to motion and the scheduling of the hearing were continued several times pursuant orders on stipulations of the parties.

April 30, 2014. The advertisement had the following title: "TABOO loving 420$^2$ lady? – m4w – 45 (nw las vegas)". The narrative portion of the advertisement stated "Hi ladies, Are you up for meeting for a fun time? 420 Nudism kinky times, no limits and NO Taboos." Pictures accompanying the Craigslist advertisement included a fully nude photograph of the poster. *See Government's Response (#62), Exhibit 1, pg. 434.*

Detective Yurek, posing as a thirteen year old female named "Tanya," responded by email to the advertisement by inquiring: "ever been with a younger girl." *Exhibit 1, pg. 437.* After Detective Yurek and the poster identified themselves to each other as "Tanya" and "Alex," Alex asked: "how old are you? and what are you looking for on here?" Tanya responded that she was "thirteen." *Id., pg. 438.*

The following exchange of emails then occurred:

Alex: so, what brought you to look at my ad?

Tanya: cuz i like 420 and thought no limits meant u didn't care about age I guess ... plus u looked legit

Alex: cool. Then, to answer your question, I have, and I enjoy it. How would you be with that?

Tanya: that cool.....:) I've always liked older guys cuz boys my age play games

Alex: Share a picture with me, of you. I had two on my ad, one was even nude=)...Only seems fair, right?

Alex: If you can share a face PIC of yourself, right now somehow, I'll give you my phone number? I need to know your legit ok?

Tanya: heres a picsy...... i only have this old ass iPod......cam is busted but have some pics on it....

*Exhibit 1, pgs. 437-440.*

Detective Yurek posted a photograph of a fully clothed female, who could be a teenager, sitting on a rock in a park area. *Exhibit 1, pg. 440.* Alex then provided Tanya with his cellular telephone number. Tanya stated that she did not have a cell phone. The following communications therefore involved Alex sending text messages from his cellular phone to Tanya's, i.e., Detective

---

$^2$ The parties have informed the Court that "420" is a code word for marijuana.

2

1  Yurek's, email (gmail) address.

2      Alex asked Tanya if she wanted to get together over the weekend.  Tanya asked him what he
3  had in mind and Alex responded: "just hanging, smoking, chatting, getting to know each
4  other...maybe more." *Exhibit 1, pgs. 441-443.*  A few minutes later, "Alex" sent an SMS message
5  from his cellular telephone to Tanya's gmail address stating "Hey Tanya" to which  Tanya
6  responded "Hi". *Id., pg. 444.*  The following exchange then occurred:

7          Tanya: So what's the youngest you've been with

8          . . .

9          Alex:   14, the age of consent in Canada is 14

10          Alex:   Have you played with anyone younger than you?

11          Tanya: Ya a couple of boys.  They suck so I now like older

12          Alex:   Lmao

13      *Id., pg. 444.*

14      After an exchange regarding the other men that "Tanya" had been with, the following
15  exchanges occurred:

16          Alex:   So, can I ask you a few questions?

17          Tanya: Sure silly

18          Alex:   What do you think and feel about desires that are taboo?  Incest, child
19                love, animals?

20          Tanya: Animals are weird.  Don't know about incest.

21          Alex:   Ok.  Well those are all the big taboos left in society

22                Lol I love them all

23                But I'm a good guy

24                Very real, down to earth. Sense of humor. lol

25          Tanya: Ur funny

26          Alex:   Nothin.  So , what experience do you have?

27          Tanya: Idk.....down for whatever;)

28                Sry my iPod is slow

|   |   |
|---|---|
| Alex: | Well, let's start with virginity.  Are you a virgin? |
| Tanya: | No |
| Alex: | It's ok if you are |
|  | Ok. |
| Alex: | How about oral?  Do you have experience? |
| Alex: | My 420 is blue dream and NY diesel |
| Tanya: | Ya I have done oral.  I like doing that. |
| Alex: | And receiving? |
| Alex: | 69 |
| Tanya: | Ya receiving.  Never done 69 |
| Alex: | 69 can be a blast. |
| Alex: | When your with someone older, do you prefer them to be in charge? |
| Tanya: | Ya I wanna learn more :) |
| Alex: | ok, I can teach you, but, only if you want that :) |
| Tanya: | U don't even know u yet |
| Alex: | Exactly |
|  | . . . |
| Tanya: | What do u mean exactly |
| Alex: | I mean, I'm jumping ahead of myself |

*Id., pgs. 445-449*

After exchanging information as to where their respective residences were located, Alex asked whether their first meeting should be in public or private.  Tanya stated that public would be better to which Alex responded: "Ok, good girl."  They agreed to meet outside a Target store in Henderson.  *Id., pgs. 449-450.*  Alex stated that he was into magic and yoga and that he had made a room in his residence into a temple.  Tanya responded: "That's cool.  I love skulls and stuff." *Id., pgs. 450-451.*  Alex asked Tanya if she lived with her parents.  She responded that she lived with her grandmother.  *Id., pg. 451.*  They then discussed how long Tanya would be able to "hang

out" with Alex and reached agreement that Alex would pick her up at 5:00 p.m. on Friday. *Id., pgs. 451-453.* The conversation then continued:

> Alex: So what do you think about this idea? When we get to my place we can take everything off, get naked and start smoking? :) I know I'm gonna need it, lol
>
> Tanya: :)
>
> Alex: Cool. This could be a lot of fun:)
>
> Alex: Can I ask you a favor?
>
> Tanya: Does 420 make u horny
>
> Alex: I don't if you shave your pubes, but I really love a baby smooth cookie :)
>
> Alex: Yeah it always makes me horny
>
> Tanya: I shave silly
>
> Alex: I wanna get some wax
>
> Alex: Good girl :)
>
> Alex: I'm open to doing wax, shrooms, molly, dmt
>
> Alex: I prefer stuff that's more organic, rather than chemical

*Id., pgs. 453-454.*

Alex also requested that Tanya send him a nude photo of herself. *Id., pg. 456.* The following exchange then occurred:

> Tanya: I just don't wanna get pregnant at 13 and wanna make sure we r gonna be safe?
>
> Alex: Oh yeah, definitely
>        Believe me, me as well :)

*Id., pg. 456.*

After discussing what alcoholic beverages they each liked, Tanya stated: "I'm a lil nervous to be honest." Alex responded: "No worries, I would be worried if you weren't nervous, haha". *Id., pg. 458.* Tanya asked whether Alex would wear a condom and he stated that he would. *Id., pg. 459.* Tanya asked Alex how much time he wanted them to spend together because she needed to come up with a plan to tell her grandmother. *Id. pg. 459.* They agreed that Alex would pick Tanya

1  up at 5:00 p.m., that she would stay overnight and would return home the next day. She would tell
2  her grandmother that she slept over at a girlfriend's house. *Id. pg. 459*
3       On the morning of May 1, 2014, Tanya sent Alex a photograph purportedly depicting her
4  face and shoulder area. Alex responded by sending a photograph depicting him wearing rabbit ears.
5  *Id., pg. 462*. Shortly thereafter, Alex sent a photograph of his penis. *Id., pg. 463*. Beginning at 8:34
6  a.m. on May 1, 2014, the following exchange occurred:
7       Alex:  Oh yeah, forgot to mention last night, I'm really love incest daddy and daughter roleplay, as well as extreme age play :) ...
8       Tanya: Ok I don't know what all that is but sounds fun. Like I act like I'm your daughter?
9       
10      Alex:  Yes, and dress and even act younger than 13, like when you were 5 or 7 or 8 :)
11      
12           Do you think you would like that?
13           Playing Pretend but totally taboo.
14      Tanya: Ok sounds fun. I don't have anything sexy to wear for u.
15      Alex:  It's okay sweety. Do you have a sun dress? Something girly, sheer? Pig tails?
16           To me that's sexy as hell. Look as young as you can for me :)
17      Tanya: Not really, U can get me something if u want. I'm a jeans and Tshirt girl
18      
19      Alex:  Ok, but would you be comfortable doing that kind of taboo roleplay?
20      Tanya: Not sure. Can try sounds fun :) Got to go sry
21  *Id., pgs. 464-465*.
22       After a three hour gap in communication, Detective Yurek, still posing as Tanya, resumed
23  communication with Alex at 12:01 p.m. on May 1, 2014 by saying "hi." Alex responded by saying
24  hi and "I'm bored at the moment. Would rather be home naked." *Id., pg. 465*. Alex further stated
25  that he had to see his lawyer the following day and would be available after 2:00 p.m. In response
26  to Tanya's question why he was seeing a lawyer, Alex stated that he was in a custody case with his
27  ex-wife and was fighting for more time to see his daughter. *Id., pg. 468*. The following exchange
28  then occurred:

6

       Tanya:  so like what are we gonna do silly man

       Alex:    Well, its up to you, at least this first time.  I can take charge but I also want to know what you want to try.

       Tanya:  well I wanna learn so u gotta show me...Im not that experienced.

       Alex:    I figure, we get nude, get high, and then, we can talk about everything.

       . . .

       Alex:    I'm naturally dominant, so, if you would like to develop a relationship where you are submissive and me dominant, that could work.

       Tanya:  not sure what all that means, but it sounds kind of fun

       Alex:    Teacher/student

                 Daddy/daughter

                 Yup, it is.

                 Basically means that:
                 I'll be guiding you.  All you need to do is let NE guide you, trust me and obey :)

*Id., pgs. 468-469.*

      Tanya thereafter asked Alex if she could call him "daddy."  Alex responded that he would love to be called daddy.  *Id., pg. 473.*  Alex further stated: "I think we would look natural together, Good dad and daughter age."  Tanya responded:  "me 2....can u send another pic plz...I gotta go back to school till 4 will hit u up after kk daddy?"  Alex responded: 'ok punkin."  *Id., pg. 474.*

      According to the Incident Report prepared by Detective Yurek, the police identified the phone number provided by Alex as belonging to Defendant Pincombe.  The police also obtained an address for Defendant through the Department of Motor Vehicles.  The picture on Defendant's driver's license matched the photograph in the Craigslist advertisement.  *Motion (#34), Exhibit 2.*  Pursuant to the arrangements made between Alex and Tanya, the plan was to have Defendant pick her up at the Target Shopping Center at 3:00 p.m.  The police set up surveillance in the shopping center parking lot.  The officers observed Defendant's vehicle pull into the shopping center at 2:25 p.m.  At 2:30 p.m, Defendant sent a text to Tanya that he was at the Target.  Defendant entered the

Target store where he purchased some items. After exiting the store and returning to his vehicle, Defendant was arrested for luring a child with the intent to solicit, persuade or lure the child to engage in sexual conduct in violation of Nevada Revised Statute (NRS) 201.560.

## DISCUSSION

Defendant asserts that the Government's conduct was so outrageous that the indictment should be dismissed. Defendant argues that Detective Yurek did not infiltrate an already existing criminal organization engaged in criminal activity. Nor did the Government have reason to believe Defendant Pincombe was engaged in criminal activity. Defendant argues, instead, that the Government "created from whole cloth the crimes they later induced and entrapped" him into committing in order to charge him with those crimes. *Motion (#41), pg. 3*.[3] Defendant also argues that because he was posting on Craigslist, which strictly prohibits participation by minors, he presumed he would be contacted by adult women. *Id., pg. 4*.

1.  **Defendant's Request for An Evidentiary Hearing.**

In his written motion to dismiss and at the hearing on this matter, Defendant requested that the Court conduct an evidentiary hearing. An evidentiary hearing on a motion to suppress evidence is only required when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist. *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000). A defendant is not entitled to a pre-trial evidentiary hearing on a motion to suppress merely because he wants one. *Id.*, at 621, citing *United States v. Harris*, 914 F.2d 927, 933 (7th Cir. 1990). Whether an evidentiary hearing should be granted on a motion to dismiss an indictment for outrageous government conduct should be governed by the same standard. This is especially true because the Defendant has the burden of proof on such a motion and must satisfy an "extremely high standard" to justify dismissal of the indictment. . . .

---

[3] For purposes of this report and recommendation, the Court assumes that Defendant Pincombe engaged in the subject communications with Detective Yurek. The government, of course, has the burden to prove all elements of the alleged crimes beyond a reasonable doubt.

Defendant did not state any reasons why an evidentiary hearing was required in his motion to dismiss. Defendant argued at the hearing that an evidentiary hearing should be held to receive testimony from Defendant Pincombe regarding his intentions with respect to the role-playing discussed in his communications with Detective Yurek. Defendant's subjective state of mind is relevant to a defense of entrapment. Where such a defense is raised, the Government has the burden of proof at trial to establish that Defendant was not entrapped. A pretrial motion to dismiss for outrageous government conduct, however, focuses on whether the government's conduct was objectively outrageous, irrespective of whether the defendant was predisposed to commit the crime. Defendant's testimony regarding his subjective state of mind is therefore irrelevant to the disposition of the subject motion. All of Defendant's communications with Detective Yurek prior to his arrest are contained in the email and text communications. There are no disputed factual issues regarding the communications for which an evidentiary hearing is required.

Defendant also argued that the Court should conduct an evidentiary hearing on the grounds that the operational and investigative standards governing such sting operations prohibit the law enforcement agents from initiating contact with the suspect. Defendant was unable to state the basis for that assertion. The Government responded that there is no such prohibition and agreed to provide the Department of Justice's written operational and investigative standards for the Court's *in camera* review. The Court has reviewed those documents *in camera* and based on that review, confirms that there is no written prohibition against officers initiating the first contact with a suspect. As discussed in the next section, whether the government agent first approached the defendant, or the defendant first approached the government agent, is a factor in determining whether the government engaged in outrageous conduct. Because there is no evidence that Detective Yurek violated any operational or investigative standards, however, an evidentiary hearing on this issue is not required.

The motion to dismiss may properly be decided based on an objective evaluation of the recorded text-email communications between the Defendant and the undercover officer. An evidentiary hearing in this matter is therefore unnecessary.

. . .

**2.     Whether the Government's Conduct Was So Outrageous as to Violate Due Process of Law and Require Dismissal of the Indictment.**

"Outrageous government conduct occurs when the actions of law enforcement officers or informants are 'so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction.'" *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013), quoting *United States v. Russell*, 411 U.S. 423, 431-32, 93 S.Ct. 1637 (1973). Dismissal based on outrageous government conduct is "limited to extreme cases in which the defendant can demonstrate that the government's conduct 'violates fundamental fairness' and is 'so grossly shocking and so outrageous as to violate the universal sense of justice.'" *Id.*, quoting *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011). "This is an 'extremely high standard.'" *Id.*, quoting *United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir. 1993) (quoting *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991). *Black* notes, as have other decisions, that there are only two reported decisions in which federal appellate courts have reversed convictions under this doctrine. *Id.*

"There is no bright line dictating when law enforcement conduct crosses the line between acceptable and outrageous, so 'every case must be resolved on its own particular facts.'" *Black*, 733 F.3d at 302, quoting *United States v. Bogart*, 783 F.2d 1428, 1438 (9th Cir. 1986), *vacated in part on other grounds sub nom. United States v. Wingender*, 790 F.2d 802 (9th Cir. 1986). However, prior cases have set forth ground rules that provide some guidance in determining whether the government has engaged in outrageous conduct. It is outrageous for government agents to (1) engineer and direct a criminal enterprise from start to finish; (2) to use excessive physical or mental coercion to convince an individual to commit a crime; or (3) to generate new crimes merely for the sake of pressing criminal charges. *Id.*, at 302 (citations to prior cases omitted).

*Black* involved a reverse sting operation conducted by the Bureau of Alcohol, Tobacco and Firearms (ATF) in which a confidential informant and an undercover ATF officer proposed a fictional narcotics stash house robbery to individuals who agreed to participate and who subsequently helped plan the robbery, recruited others to join the robbery crew, obtained weapons, and then showed up at the rendevous location for the robbery where they were arrested. *Id.*, 733

F.3d at 298-301.  The court expressed two reservations about the ATF operation.  First was the fact that the proposed robbery was fictional.  The law enforcement agents did not infiltrate an ongoing criminal conspiracy that was planning an actual robbery.  The second and more major concern was that the confidential informant recruited individuals who were not known to have participated in similar previous crimes.  The court stated that "[t]he risk inherent in targeting such a generalized population is that the government could create a criminal enterprise that would not have come into being but for the temptation of a big payday, a work of fiction spun out by government agents to persons vulnerable to such a ploy who would not have otherwise thought of doing such a robbery." *Id.*, at 303.  The court stated that the initiation of the sting operation warranted close scrutiny and placed the burden on the government to show that the court's concerns were not borne out in the subject case.  *Id.*

Based on its review of prior cases, the court identified six factors as relevant in analyzing whether the government's conduct is outrageous: (1) the known relevant characteristics of the defendant; (2) individualized suspicions of the defendant; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendant to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.  *Black*, 733 F.3d at 303.  The court noted that these factors do not constitute a formalistic checklist, but help the court to focus its analysis of the totality of the circumstances.  *Id.*, at 304.

The first two factors, the known relevant characteristics of the defendant and whether the government has individualized suspicion of the defendant, are closely related.  The government does not need to have an individualized suspicion of a defendant's wrongdoing before conducting an undercover investigation.  *Black*, 733 F.3d at 304, citing *United States v. Luttrell*, 923 F.2d 764, (9th Cir. 1991).  Whether the government had reason to suspect an individual or group before initiating the sting, however, is an important consideration in determining whether the government's conduct was outrageous.  *Id.*, citing *United States v. Bonanno*, 852 F.2d 434, 438 (9th Cir. 1988).  In some cases, the government may appropriately focus on a category of persons it has reason to believe are

11

involved in the type of illegal conduct being investigated. *Id.*

In this case, Detective Yurek did not have any knowledge of Defendant Pincombe prior to initiating the undercover operation in response to the Craigslist advertisement. Nor did Defendant's advertisement expressly solicit sexual relations with underage females. It was possible that Defendant was only interested in sexual activities with adult females which, while deviant and violating certain societal taboos, were not per se illegal.[4] On the other hand, the phrase "no limits and NO Taboos" could reasonably indicate that Defendant was seeking or, at least willing, to engage in sexual relations with underage females. Given the ambiguity of the advertisement, it was reasonable for Detective Yurek to initiate contact with Defendant to determine if he was seeking unlawful sexual relations with underage females.

Factor three considers the government's role in creating the crime of conviction. *Black* states that under this factor, it is relevant whether the government approached the defendant initially or the defendant approached the government agent, and whether the government proposed the criminal enterprise or merely attached itself to one that was already established and ongoing. *Id.*, 733 F.3d at 305. Among the cases cited by the court under this factor is *United States v. Mayer*, 503 F.3d 740, 747 (9th Cir. 2007) in which the defendant, rather than the undercover officer, was the first to broach traveling internationally to have sex with children. *Id.*, at 305. The court in *Black* further noted its concern that the government had created the proposed crime, initiated contact with the defendants "and set the bait—all without any previous individualized suspicions—or even knowledge—about the defendants' criminal history or activities." 733 F.3d at 306. The court's concerns were nonetheless mitigated to a large degree because the defendants told the undercover agent very early and often that they had engaged in similar criminal activity in the past. Moreover, once the undercover officer "set his bait, the defendants 'responded *without further inducement by the government.*' (citation omitted). Instead, they responded with enthusiasm. They were eager to commit the fictional stash house robbery, and they joined the conspiracy without any great

---

[4] Defendant's counsel suggested at the hearing that Defendant was interested in adult fantasy role-playing, i.e, engaging in sexual relations with an adult female who would pretend to be a child.

inducement or pressure from the government." *Id.*, at 307.

In this case, Defendant Pincombe took the first step by soliciting sexual contact with willing females. A reader of the advertisement could reasonably suspect that Defendant was receptive to sexual contact with underage females based on the phrase "no limits and NO Taboos." Detective Yurek initiated contact with Defendant by asking whether he had "ever been with a younger girl." In quick response, Defendant asked "how old are you" and Detective Yurek answered "thirteen." Although Detective Yurek first brought up the subject matter of illegal sexual relations with an underage female, the manner in which this was done and how Defendant responded is more telling. Detective Yurek did not lead Defendant on with the prospect of sex with a willing female partner, and only after Defendant's interest and desire had been further aroused, inform him that the responder was thirteen years old. Defendant had the opportunity at the beginning of the encounter to tell "Tanya" that he was not interested in sex with a thirteen year-old and terminate the contact. Instead, he responded by stating: "Then, to answer your question, I have, and I enjoy it." In response to Tanya's question a few minutes later, "so what's the youngest you've been with," Defendant responded "14, the age of consent in Canada is 14."

Defendant followed-up this initial discussion with questions regarding Tanya's thoughts and feelings about desires that are taboo–incest, child love and animals; whether she was a virgin; whether she shaved her pubic area; and whether she had engaged in oral sex. He also asked whether she would prefer him to be in control, how they could arrange to meet, and discussed the use of drugs besides marijuana. The following morning, Defendant also broached the idea of Tanya acting out an incest scenario in which she would portray a much younger child–five to eight years of age—and dress in manner to fulfill Defendant's child sex fantasy.

The fourth factor considers the government's encouragement of the defendant to commit the crime. *Black* notes that mere encouragement is of lesser concern than pressure or coercion. 733 F.3d at 308. Detective Yurek encouraged Defendant to commit the crime by representing himself as a thirteen year old female who was willing to have sex with Defendant, and by responding positively to Defendant's inquiries about "her" willingness to engage in various sex acts, and deviant role-playing. The texts and emails, however, also show that Detective Yurek did nothing beyond

providing affirmative and cooperative responses to encourage Defendant in the commission of the crime. Defendant Yurek, in fact, raised some reservations which could have deterred Defendant from pursuing the crime had he been less disposed to do so. Tanya, for example, expressed her fear about becoming pregnant and asked Defendant if he would wear a condom. "She" told Defendant that she would have to be home by a certain time and would have to make up a story for her grandmother. Tanya also stated that she was nervous about the encounter. Defendant, by contrast, expressed no reservations other than his initial concern about whether Tanya was "legitimate." There is nothing in the exchanges to indicate that Defendant had to be persuaded against his better judgment to move forward with the proposed sexual encounter.[5]

The fifth factor considers the nature of the government's participation in the offense conduct. *Black* states that the duration of the government's participation in the criminal enterprise is significant, with participation of longer duration being of greater concern than intermittent or short-term government involvement. The court looks at whether the government acted as a partner in the criminal activity, or more as an observer of defendant's criminal conduct. 733 F.3d at 308. The court also considers the necessity of the government's participation in the criminal enterprise--whether the defendants would have had the technical expertise or resources to commit such a crime without the government's intervention. *Id.*, at 309.

In considering the application of this factor, it important to note the differences between the reverse sting in *Black* and the reverse sting at issue here. In *Black*, the ATF set the stage for the commission of a fictional robbery in which the undercover agents provided the defendants with the basic outline of the robbery and when and where it would take place, but then allowed the defendants to plan the details of the crime, assemble the robbery crew, and obtain the weapons and other equipment that would be used in its commission. In such a sting operation, the government is

---

[5] As previously stated, the focus of a motion to dismiss for outrageous government conduct is on the government's conduct and not on whether the defendant was predisposed to commit the crime. The Court comments on Defendant's conduct only as it is relates to the reasonableness or unreasonableness of Detective Yurek's conduct. Defendant apparently intends to assert a defense of entrapment in which his state of mind will be at issue, and on which the Government has the burden of proof at trial. *See United States v. Davis*, 36 F.3d 1424, 1430 (9th Cir. 1994).

able to and should allow the suspects to take the material steps to commit the fictional crime without the undercover agents controlling the entire manner and means of its commission.  In a sting operation such as the one in this case, however, the undercover officer portrays himself or herself both as a partner in the criminal activity, as well as its intended victim.  Given the undercover officer's central role in arranging the contemplated crime, it would be impossible to uphold the validity of this type of sting operation if the fifth factor was given decisive effect.  More germane to whether the government crossed the line into outrageous conduct is whether the undercover officer targeted someone who showed no interest or disposition to commit the crime, and the degree to which the undercover officer enticed, persuaded or coerced the defendant into agreeing to the crime.

This leads to the sixth and final factor identified in *Black*: the nature of the crime being pursued and the necessity for the actions taken in light of the nature of the criminal enterprise at issue.  The reverse sting operation in this case was obviously designed to interdict individuals who use dating or "casual encounter" websites to solicit underage individuals for unlawful sexual contact.  The actual victims of these crimes are children whom society recognizes must be protected against their own immaturity, misguided inclinations, and potential misjudgment of the dangers posed by the perpetrators.  Actual child victims are likely to conceal their involvement in such crimes not only from law enforcement, but also from their parents or legal guardians.  These factors obviously hinder the ability of law enforcement to prevent the commission of such crimes through other investigative methods and make the use of reverse sting operations more acceptable.

Other courts have upheld similar reverse sting operations against charges of outrageous government conduct. *See United States v. Mayer*, 503 F.3d 740 (9th Cir. 2007) (undercover FBI agent joined organization that promotes sex with children and engaged in internet communications with defendant to arrange sexual encounters with children); *United States v. Goodwin*, 854 F.2d 33 (4th Cir. 1988) (government set up a mail order business distributing child pornography and sent advertisements to individuals who showed a disposition to purchase such materials); *United States v. Larson*, 2015 WL 729738 (N.D.Cal. 2015) (undercover agent advertised on an internet chat room, which promoted discussions of child pornography and sexual contact with children, that his

fictitious mentally impaired daughter was available for sexual relations); and *United States v. Cruz*, 2013 WL 3833033, *8 (E.D.Cal. 2013) (defendant posted Craigslist advertisement in which he sought a "'bdsm relationship' with someone that must be over 18 (duh), but look younger." Notwithstanding defendant's advertisement, the undercover officer posed as a thirteen year old female whom defendant subsequently arranged to meet for sex).

Judges in this district have denied motions to dismiss indictments based on outrageous government conduct that involved circumstances nearly identical to those alleged in this case. *See United States v. Sapper*, 2013 WL 4857775 (D.Nev. 2013) and *United States v. Rocha*, 2014 WL 6983311 (D.Nev. 2014). In denying the motion to dismiss in *Sapper*, the district judge summed up the defendant's conduct as follows:

> Defendant Sapper may not have initiated the contact with the undercover agent he believed to be a 14-year-old girl, but he quickly rose to the bait and was thereafter the party responsible for all aspects of the crime. It was Defendant who asked "how young?" and was undeterred by the response (and later reminders) that she was 14 years old. Doc. 13 at 35, 37; asked for photos, *id.* at 35; turned the conversation sexual in nature, *id.* at 36; indicated he would "love to set something up" with the responder, *id.*; significantly escalated the sexual nature of the conversation by proposing various specific sex acts he wanted them to perform on each other, *id.* at 37-42; encouraged her to sneak out of her house and meet him so that they could engage in such acts, *id.* at 39-42; suggested what she should wear for the rendevous, *id.* at 42; and drove the pre-described car to pick her up at the agreed upon location and time.

*Sapper*, 2013 WL 485775, at *6.

With a few minor changes, the court's description in *Sapper* matches the conduct of Defendant Pincombe. The foregoing decisions support the conclusion that the Government's conduct in this case was not outrageous.

## **CONCLUSION**

The Court concludes that Detective Yurek did not engage in outrageous conduct. Defendant's advertisement provided Detective Yurek with reason to suspect that the poster was interested in sexual relations with underage females. Although Detective Yurek initiated the discussion of sex with a thirteen year-old female, Defendant was immediately receptive to the proposition. Detective Yurek did not engage in undue efforts to entice or persuade Defendant to

engage in the unlawful sexual conduct. To the contrary, the evidence demonstrates Defendant's willingness to engage in sexual conduct with an individual who identified herself as thirteen years old. Defendant took the lead in discussing the proposed sexual activities and in arranging to meet with the female who, unbeknownst to him, turned out to be an undercover police officer. Accordingly,

## RECOMMENDATION

**IT IS RECOMMENDED** that Defendant's Motion to Dismiss for Outrageous Government Conduct (#41) be **denied**.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 3rd day of November, 2015.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge